Good morning. Lawrence Rolfing on behalf of Maha Nazzal, the appellant in this case. Mrs. Nazzal suffers from fibromyalgia, and the question before the court is whether the administrative law judge that heard this case had a good reason for rejecting the opinions of the independent or agreed medical examiner, Rodney Bluestone. The commissioner contends, as the district court found, that the ALJ was permitted to rely upon the opinions of Dr. DeBolt and Dr. Meltzer, principally Dr. DeBolt. That was the one that the ALJ facially relied upon. Excuse me, counsel. Let me get at what's concerning me in this case. The diagnosis of fibromyalgia cannot be supported by objective findings because the nature of the disease or syndrome is that there are no objective findings. The way it's usually done is the patient describes pain at I think there are 14 points and there have to be at least six, something like that. I can't remember the exact number. If the pain reports are consistent with the diagnostic criteria, the doctor diagnoses fibromyalgia. Am I right so far? Yes. After excluding all other causes, yes. Now, the next step is since the doctor has to rely on patient symptom reports, the patient's honesty in describing the symptoms to the doctor, besides honesty, also accuracy, people can be honest, but misperceived, it determines whether the diagnosis is reliable. Here it looks to me as though the daily activities that the ALJ notes, just ordinary activities of a wife and mother, basically, who is not employed outside the home, visiting, going to the doctor, helping her kids with their homework, going to church, walking, going for walks, he thought that was inconsistent with her description that her pain is nine out of ten every day. And so she was not believable. Now, if that's so, I don't see why that isn't a substantial and specific basis for rejecting the report of the treating physician, since he, too, had to rely on her credibility. One of the principal problems with that particular scenario that you've painted, Your Honor, is that the physicians are employed and know when a recitation of symptoms and limitations fits the diagnostic criteria and when people are feigning. And even Dr. DeBolt, when he said that Ms. Nizal could perform the exertional demands of light work, Dr. DeBolt said, based on subjective complaints. Well, which subjective complaints did Dr. DeBolt rely upon? And we get into the position where we have what's good for the goose is good for the gander, and it is an inconsistent use of the administrative fact-finding process to reject one doctor's opinion on a stated ground. And there are all kinds of specifics in these reports, like I just opened almost randomly the Diamond Medical Group here. She climbs on and off the examining table easily and sits comfortably without using the arms for support, stands on one foot to push away the stepstool, goes from supine to sitting and vice versa easily without difficulty. I mean, that's the way doctors describe malingering. When a patient says, oh, I can't do this, I can't do that, but then they watch the patient do it fine. Dr. Bluestone recommended in his report that the best treatment for Ms. Nizal was to remain as active as possible to keep her body moving and that she not stay in a static position. And so for her to walk into the examining room and get all of her limbs out of the way, that's not a good thing. And so for her to sit on the examining table and get off the examining table, which has already been moving, is consistent with what Dr. Bluestone said. And the most important thing, Your Honor, is in Record 122 of the same report that you just read from, Dr. Meltzer says, I have repeatedly in the past discussed my feelings about fibromyalgia. It has been noted in the medical journals by rheumatologists stating that the pain exists, but fibromyalgia does not. So we have a physician who is stating emphatically, stop sending me fibromyalgia cases, I'm not ‑‑ I don't believe the condition exists. And Dr. Meltzer does not have the license to draw that, to make that statement, because the commissioner determines ‑‑ The MD doctor's license. But the commissioner is charged by the statute with flushing out the contours of what a medically determinable impairment is. And the commissioner says in Social Security Ruling 992P that fibromyalgia is a medically determinable impairment and that fibromyalgia may be disabling, despite the fact that there are no truly objective findings. Isn't all that determined, of course, by the Beneke case, which says that fibromyalgia exists in the Ninth Circuit anyway? That's correct, which is consistent with the Seventh Circuit decision by Judge Posner and Sarchet and circuits all over the country. There isn't even a split in the circuits. It's your argument that if a patient reports pain and her treating physician says she has fibromyalgia, she must be awarded disability and there is no way an ALJ can reject the claim? No, I'm not saying that, Your Honor. The reason I'm not saying that is ‑‑ What could be a basis if the daily activities and the reports of other physicians aren't? Well, for instance, Dr. Bluestone says that what he recommends for Ms. Nizal is that she go back to some type of part‑time work and slowly build up her tolerance for work activity and perhaps in six months she would have the ability to engage in full‑time work activity. That's the kind of evidence that we would be looking for to assess the ability of an individual to engage in work activity. I notice that she won't take her medications and she won't do the things that her doctors tell her to do. I would think usually doctors use that as a diagnostic criterion. If you give the patient pills and they won't take them, it's evidence that they don't really think they need the pills. In addition, if what he recommends is to make her better so she can work and she doesn't want to work, she has every reason not to do what he says. Dr. Bluestone made specific treatment recommendations. There is no treatment for fibromyalgia. She needs to treat this at home and keep active and keep moving. That's what Dr. Bluestone said. And Dr. Bluestone does not occupy the position of a treating physician who may or may not side with their patient. Dr. Bluestone doesn't occupy the position of a doctor hired by the administration or some other party on the presumption that he would be neutral, but rather Dr. Bluestone was appointed by the Workers' Compensation Appeals Board and agreed upon by the parties in that case for one singular purpose, to be neutral. And so when Dr. Bluestone synthesizes the clinical evidence in front of him, he's not paid to side with either side. He's paid to be neutral. In that setting, he was the medical arbiter of fact. And that is an important factor of the role of the physician that the ALJ just simply ignored in adjudicating this case. He did not articulate a single reason for rejecting the opinions of Dr. Bluestone. And as between Dr. DeBolt and Dr. Bluestone, Lester tells us that Dr. Bluestone deserves more weight than Dr. DeBolt. And I would like to reserve my remaining minute. Thank you. Counsel. Good morning, Your Honors. My name is Leo Montenegro, appearing for the Appellate Commissioner of Social Security. Your Honor, claimants portrayed this case as a disagreement between Dr. Bluestone and Dr. DeBolt, that is, that the ALJ had relied on Dr. DeBolt over the opinion of Dr. Bluestone. Dr. DeBolt was a medical expert who did not appear at the hearing. But after all the evidence was taken and a hearing was held, the ALJ went to Dr. DeBolt, asked him to review the evidence and to assist in interpreting the evidence by giving the ALJ an opinion. A subsequent hearing was held after that to allow the claimant to address any problems with that, with Dr. DeBolt's opinion. But as a non-examining physician, isn't the ALJ required to give that less weight than examining physicians? In general, yes. Under the regulations, Your Honor, under the business regulations, non-examining physicians' opinion is generally accorded less weight simply because it's someone who hasn't examined the claimant, hasn't had a relationship with the claimant. But in this situation, this was someone, Dr. DeBolt was someone, whom the ALJ went to specifically to review all the evidence in the record and to assist in interpreting. There's a slight distinction between a non-examining physician and here, where the non-examining physician appeared generally as a medical expert to review the record and to assist the ALJ in reaching a conclusion. Tell me why Dr. DeBolt's qualifications are not inferior to Dr. Bluestone's qualifications as to fibromyalgia, which we're told in Beneke is a disease treated by rheumatologists rather than neurologists. Your Honor, I don't think that Dr. DeBolt's opinion should be discounted just because of his specialty. He is a medical doctor, and in this situation, he did review. They're both medical doctors. They can both express an opinion. But what is the specialty that's been recognized as treating fibromyalgia to rheumatology? And the general specialty of neurology treats without operation all nerve problems. Should we give greater weight to the specialty that treats this disease as opposed to the general specialty which treats that disease and other diseases? Well, to cut to the chase, Your Honor, as I understand it, there's no dispute over whether Klayman has fibromyalgia. The ALJ found in the Klayman's favor in that regard. The ALJ expressed some, I believe, the ALJ's decision expresses some frustration with the evidence. There was evidence in all different directions, which is why he went to Dr. DeBolt, I believe, to help him interpret these opinions. So here's not the question whether she has disease and whether the disease exists, but what the extent of her disability account the disease is. Exactly, Your Honor. And to that extent, Judge DeBolt also gave an opinion as to, not just as to whether there were objective findings or not, but what the functional limitations were, although Dr. DeBolt himself did point out that there were no objective findings. Well, there can't be any objective findings in fibromyalgia any more than there can be to a headache, right? That's true, Your Honor. The two doctors who were at issue here, Dr. DeBolt and Dr. Bluestone, both of them repeatedly said that there were no objective findings, and I don't think there's any dispute over that either. The dispute, as you said, is what the extent of the functional limitations are. Both doctors did come up with some functional limitations. Dr. DeBolt's were based on various reports in the record, which he cited, of the many different doctors who had examined the claimant, and also the non-examining physicians who had also reviewed the record. I'm having trouble. He's a non-examining physician. He doesn't have the relevant expertise in the Commissioner's regulations say that testimony from an expert is entailed to greater weight. And so why did the ALJ not err in giving any weight to Dr. DeBolt's analysis without making specific reasons to discount the two rheumatologists? Well, Your Honor, the ALJ did give reasons for rejecting Dr. Bluestone, and I believe Dr. Salek was the other rheumatologist. The ALJ, well, first, it's kind of obvious, but did rely on Dr. DeBolt's opinion over those two rheumatologists. I should say that Dr. Salek, the other rheumatologist, from what I understand, did not give an opinion as to any specific functional limitations. Both Drs. Bluestone and Dr. Salek saw a claimant in connection with a workers' comp claim that that program is not analogous to social security disability. The criteria are different. The language is different. Dr. Salek said, I believe, that the claimant was totally disabled. That term doesn't have any import with respect to social security. In fact, it's specifically excluded from consideration by the regulations because for social security purposes, not only is medical import, but vocational import and vocational issues are outside of the doctor's medical expertise. But the ALJ did give reasons for rejecting those two opinions. What were the reasons, sir? One of the reasons, Your Honor, was that I believe Dr. Bluestone had given a list of functional limitations, but even then only described claimant's pain as, I believe it was mild to a minimal to slight on an intermittent basis, which was completely inconsistent, first of all, with claimant's own portrayal of her symptoms, which were at the hearing that she had five bad days a week in which she was essentially bedridden. So Dr. Bluestone's opinion that she had various functional limitations. Where is there any evidence in the record that she claimed to be bedridden? Would you give me that citation? I see that, Doctor, that the ALJ talks about it, but I was unable to find any statement by the claimant that she claimed she was essentially bedridden. That seemed to be a characterization of the ALJ. Yes, Your Honor. It was a characterization by the ALJ. It was a summary of what the claimant had said at the hearing, at the administrative hearing. When did the claimant say that she was rendered bedridden as opposed to taking naps or lying down two or three times a day? Well, Your Honor, at the one of the hearings in the record, pages 303 and 304, I believe the excerpts of record are numbered the same way, the claimant testified when asked to describe a bad day, she said, I'm resting in bed and I can't talk. I can't see anybody. I have to sit in the room and close the door and stay in there. This is the most thing I do when I am a bad day. When I have a bad day. But she said she had good days and bad days. On good days, she'd go to her church, right? Yes, that's true, Your Honor. On bad days, she'd sit and she had a bad back. But the line of questioning immediately prior to that by her attorney was how many bad days in a week do you have average? And her response was five days. So five days of the week, she was resting in bed, couldn't talk, couldn't see anyone sitting in her room and closing the door. So that's what the ALJ had interpreted or summarized as being essentially bedridden. Now, given the degree of limitations assessed by all the doctors in the record, no one had assessed limitations that extreme. And beyond that, the ALJ had pointed out that, and the doctors had pointed out themselves, claimant had not received treatment for periods of time, was not even seeing a physician for periods of time, although she's claiming disability since 1997. Dr. Bluestone himself, as I mentioned, only characterized her pain as minimal to slight, had commented on her lack of treatment. And as the district court noted, if you take Dr. Bluestone's opinion as true about her functional limitations, Dr. Bluestone had projected those functional limitations as existing for only six months, not long enough to satisfy the commissioner's criteria for disability. If we reverse, it will go back to step four and five for purposes of a residual capability, functional residual capability assessment and see if she can do any work, right? She's not entitled to disability if we reverse. I'm sorry, Your Honor. I didn't understand your question. If we reverse, it will go back to the commissioner for determination of any residual functional capacity, correct? Yes, Your Honor. The ALJ found that she could do her past work. If this court reverses, the ALJ would either reassess whether she could do her past work based on any new functional capacity assessment or perhaps proceed onto the next step of the analysis, which is to ascertain whether she could do other work existing in significant numbers in the national economy. There was one thing that Dr. Bluestone said that I couldn't find. He said, the cause of disability has been indicated in my past reports. Do you know what report he's referring to and what cause he's referring to? I know, Your Honor. I've got my notes in front of me. There were two reports by Dr. Bluestone in the record. The first one, April 2002, record page 151, and the second one in 2003, record page 145. The limitations, his opinion as to her limitations, are contained in the second report at record page 149. And that's where he says that she could stand, walk, sit at will, and thereby stay physically mobile, can tolerate 70 percent of usual work stress, can work four to six hours a day for the first six months, specifically limiting his opinion as to six months. At the same time, he referred her to vocational rehabilitation. So he obviously didn't believe her to be completely incapable of work for any extended period of time, given that opinion and his referral of her to vocational rehabilitation. He either contemplated that she could work or at least do vocational rehabilitation, and if not at that time, certainly after completing vocational rehabilitation, certainly after six months. As Judge Page said earlier, because fibromyalgia eludes objective analysis, the issue is whether claimant's self-reported limitations were credible. Claimant has not disputed that below. There were reasons in the record to support ALJ's credibility finding and the analysis of the medical, the conflicting medical opinions. ALJ properly relied on Dr. DeBolt, whom we specifically called apparently to review the medical evidence and to assist him in reaching this conclusion. Therefore, the ALJ's decision is supported by substantial evidence. If there are no further questions, Your Honor. Thank you. The requirement to address medical specialty and basis of knowledge, the length of the relationship is found in 404.1527 of Title 27 of the Code of Federal Regulations. By not addressing those mandatory factors, as Your Honor has pointed out, the ALJ specifically erred. Counsel also referred to the proposition that workers' compensation reports speak a different language. Well, the case of Ms. Rosiers v. Secretary of Health and Human Services stands for the specific proposition that the ALJ is obligated to translate terms of art so that they are useful in this forum. And the ALJ didn't do that. The ALJ also, as Mr. Montenegro pointed out, quoted or paraphrased Dr. Bluestone's report. The very next sentence, or two sentences down, Dr. Bluestone says there is moderately severe sleep disruption, leading to a moderate degree of subjective fatigue. And that's at page 148 of the record. And when Dr. Bluestone comments about vocational rehabilitation, he says she's a qualified injured worker. Qualified injured worker is a term of art that's at page 149. It means medically not capable of returning to their past relevant work. It does not imply that they're vocationally feasible. Thank you. Thank you, counsel. Thank you. Thank you. The addall v. Astro is submitted. We'll hear Bakersfield Energy v. Commissioner.
judges: Kleinfeld, Bea, Ikuta